United States Court of Appeals,

Fifth Circuit.

No. 92-2361.

Robert E. WILLIS, Plaintiff-Appellant,

v.

ROCHE BIOMEDICAL LABORATORIES, INC., E.I. du Pont de Nemours & Company, George M. Allison, M.D., Bill Pace, Bill Bringhurst, Martha Kivlovitz, Defendants.

Roche Biomedical Laboratories, Inc., Defendant-Appellee.

June 6, 1994.

Appeals From the United States District Court for the Southern District of Texas.

Before KING and JOLLY, Circuit Judges, PARKER,[*] District Judge.

ROBERT M. PARKER, District Judge:

Robert E. Willis ("Willis") filed this action in Texas state court on July 31, 1991, asserting negligence and defamation claims arising out of a test of Willis's urine that resulted in a false positive for methamphetamines. Willis brought action against Roche Biomedical Laboratories, Inc. ("Roche"), the laboratory that performed the urinalysis; E.I. du Pont de Nemours & Company ("Du Pont"), his employer; and four Du Pont employees, George M. Allison, M.D., Bill Pace, Bill Bringhurst, and Martha Kivlovitz. (The Du Pont company and its employees are referred to collectively as "the Du Pont defendants" or Du Pont.)

On August 22, 1991, the Du Pont defendants, joined by Roche, removed the action to federal court on the ground that Willis's

[*]Chief Judge of the Eastern District of Texas, sitting by designation.

1

claim arose under the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. The district court subsequently granted the Du Pont defendants' motion to dismiss because Willis had failed to exhaust his contractual remedies. Although Willis appealed from the order of dismissal, that appeal has been previously dismissed and is not now before this Court.

On June 29, 1992, the district court granted Roche's motion for summary judgment and this appeal followed.

## I. SUMMARY OF CASE FACTS

The district court concluded that the following facts were established by the summary judgment evidence; and neither party disputes that this portion of the district court's opinion is correct.

Plaintiff-Appellant Willis has been employed by Du Pont at its La Porte, Texas chemical plant since March 26, 1979 as a utility helper. At all times relevant to this lawsuit, his employment was governed by a collective bargaining agreement, which included a substance abuse policy covering La Porte plant employees. In July 1990, Du Pont, in alliance with the Union, instituted a random drug testing policy.

Du Pont contracted with Roche to conduct the screening and testing of urine samples provided by Du Pont in accordance with strict protocol procedures in the contract.

On August 2, 1990, Du Pont ordered that Willis participate in a random drug test, in accordance with its substance abuse policy. The test was performed by Roche and a report issued to Du Pont,

2

pursuant to a consent form signed by Willis. The report indicated that Willis had tested positive for methamphetamine use. Willis remained employed at Du Pont and continued to receive his regular salary after Du Pont received Roche's report. Willis was placed on restricted work duty and was sent to a physician. Plaintiff was also required to attend counseling sessions and was required to submit to follow up testing.

On November 2, 1990, Roche informed Du Pont that Willis's drug test had registered a "false positive" (for methamphetamine use). The false positive was the result of confusing the presence of over the counter cold medication with the presence of illegal methamphetamine in Willis's urine. Upon learning of the mistake, Du Pont compensated Willis for lost time and for medical expenses.

Willis brought suit for negligence, gross negligence, and libel and slander—contending that his damages included various aspects of mental suffering and the loss of his good name and reputation. He also claimed monetary damages, but acknowledged that Du Pont had made monetary amends with regard to the payment of these sums in the form of lost work time repayment and reimbursement for medical expenses.

## II. GOVERNING LAW

In its Memorandum Opinion and Order denying Willis's motion to remand the case to state court, the district court found that Willis's state law claims were preempted by § 185 of the LMRA. If that is correct, the questions before us are governed by substantive federal law. *Republic Steel Corp. v. Maddox,* 379 U.S.

3

650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965) (substantive federal law applies to suits on collective bargaining agreements covered by this section [§ 185].)  However, the court below applied state law to the claims in its Memorandum Opinion granting summary judgment to Roche.

We hold that Willis's claims against Roche are not preempted by the LMRA, because they do not require an interpretation of the collective bargaining agreement for resolution.  Rather, the district court had pendant jurisdiction over these state claims, and it appropriately applied Texas law.

### III. APPLICABLE STANDARD OF REVIEW

Willis challenges the district court's interpretation of Texas law and its determination that no genuine issue of Defendant's negligence existed in the summary judgment record.  We review *de novo* the district court's determination of state law. *See Salve Regina College v. Russell,* 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991) ("The obligation of responsible appellate review and the principle of a cooperative judicial federalism underlying *Erie* [*Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ] require that courts of appeals review the state-law determination of district courts *de novo.*").  The standard of review at the appellate level of a district court's grant of summary judgment requires the same analysis as employed by the trial court.  *See* FED.R.CIV.P. 56(c).  Legal questions raised by a grant of summary judgment are reviewed *de novo.*

To recover under a negligence cause of action, the plaintiff

(here, Willis) must establish that the defendant owed a legal duty to the plaintiff, and then, that the defendant breached this duty, and that damages proximately caused by this breach were suffered by the plaintiff. *See, e.g., Otis Engineering Corp. v. Clark,* 668 S.W.2d 307, 312 (Tex.1983). The first question in a negligence case such as this one—whether a *duty* from the defendant toward the plaintiff exists—is obviously a pure legal issue, reviewed by this Court *de novo.* The second question, whether any such duty was breached by the defendant, is a more nuanced "legal" issue for *de novo* review by this Court; it is a legal issue only to the extent the district court decided that, *as a matter of law,* the plaintiff had failed to establish the existence of a material issue of genuine fact on the breach question. *See, e.g., Jones v. Southern Marine & Aviation Underwriters Inc.,* 888 F.2d 358, 360 (5th Cir.1989) ("For summary judgment to be granted, the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, must demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.").

The party moving for summary judgment under Federal Rule of Civil Procedure 56 (here, Roche) bears the burden of establishing that its opponent has failed to raise a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Rule 56 first imposes a burden of production on the moving party to make a *prima facie* showing that it is entitled to summary judgment. In a case in which the

5

nonmoving party bears the ultimate burden of persuasion at trial—such as this case—the movant might satisfy its burden shifting obligation by either: (1) submitting evidentiary documents that negate the existence of some material element of the opponent's claim or defense; or (2) demonstrating that the evidence in the record insufficiently supports an essential element of the opponent's claim or defense. If (and only if) the movant satisfies this *prima facie* obligation, the movant will have sufficiently "shifted" the summary judgment burden to the *nonmovant*—to demonstrate that summary judgment is actually inappropriate. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-327, 106 S.Ct. 2548, 2552-55, 91 L.Ed.2d 265 (1986); *Lavespere v. Niagara Machine & Tool Works, Inc.,* 910 F.2d 167, 178-179 (5th Cir.1990), *cert. denied,* --- U.S. ----, 114 S.Ct. 171, 126 L.Ed.2d 131 (1993).

Of course, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action.' " *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555 (quoting FED.R.CIV.P. 1; and citing William W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 467 (1984)). Nevertheless, just as settled is the principle that, when viewing summary judgment motions, courts must be vigilant in determining whether either an inference or circumstantial evidence might suffice to create the existence of a

6

factual dispute about the claims—lest courts "use summary judgment as a "catch penny contrivance to take unwary litigants into [their] toils and deprive [the litigants] of a trial [to which they are actually entitled].' " *Fontenot v. Upjohn,* 780 F.2d 1190, 1197 (5th Cir.1986) (quoting William W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 466 (1984), which in turns quotes *Whitaker v. Coleman,* 115 F.2d 305, 307 (5th Cir.1940)). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); *id.* at 251-252, 106 S.Ct. at 2511-12 ("the inquiry ... is ... whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."). Indeed, a court's determination of a summary judgment motion—whether there exist genuine issues of material fact—requires deference to the nonmoving party. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970) (any doubt as to the existence of a genuine issue for trial should be resolved against the moving party); *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) ("[o]n summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion."). *See also e.g., Jones v. Southern Marine &*

*Aviation Underwriters Inc.,* 888 F.2d 358, 360 (5th Cir.1989) ("fact questions are considered with deference to the nonmovant."); *Archie By Archie v. Illinois Central Gulf Railroad Co.,* 709 F.2d 287, 288 (5th Cir.1983) ("In reviewing a district court's grant of summary judgment, we are required to consider the evidence "in the light most favorable to the party resisting the motion.' ") (quoting *Trevino v. Celanese Corp.,* 701 F.2d 397, 407 (5th Cir.1983); FED.R.CIV.P. 56); *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238 (3rd Cir.1983) ("[i]f ... there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment...."), *rev'd on other grounds sub nom. Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Or, as Justice White explained in his "majority fifth vote," concurring opinion in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986):

> [T]he movant must discharge the burden the Rules place upon him: It is not enough to move for summary judgment without supporting the motion in any way *or with a conclusory assertion that the plaintiff has no evidence to prove his case.*
>
> A plaintiff need not initiate any discovery or reveal his witnesses or evidence unless required to do so under the discovery Rules or by court order. Of course, he must respond if required to do so; but he need not also depose his witnesses or obtain their affidavits to defeat a summary judgment motion asserting only that he has failed to produce any support for his case. It is the defendant's task to negate, if he can, the claimed basis for the suit.

*Celotex,* 477 U.S. at 328, 106 S.Ct. at 2555 (emphasis added).

Moreover, it is especially difficult for a defendant to

8

prevail on a Rule 56 summary judgment motion when the motion is based on the assertion that there is no factual dispute with regard to an issue of *negligence*—inasmuch as those questions (*i.e.,* of whether the defendant used reasonable care relative to a task in issue) are in general regarded as being within *the special competence of the jury.* 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER AND MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE, CIVIL 2d, § 2729 (Supp.1993). *See also Lavespere v. Niagara Machine & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990) ("this court has consistently declared that "the use of summary judgment is rarely appropriate in negligence or products liability cases, even where the material facts are not disputed.' ") (quoting *Trevino v. Yamaha Motor Corp.,* 882 F.2d 182, 184 (5th Cir.1989); other citations omitted), *cert. denied,* --- U.S. ----, 114 S.Ct. 171, 126 L.Ed.2d 131 (1993); *see also Gauck v. Meleski,* 346 F.2d 433, 437 (5th Cir.1965) ("Because of the peculiarly elusive nature of the term "negligence' and the necessity that the trier of fact pass upon the reasonableness of the conduct in all the circumstances in determining whether it constitutes negligence, it is the rare personal injury case which can be disposed of by summary judgment, even where historical facts are concededly undisputed.").

IV. ANALYSIS

We turn now to the question(s) of whether the district court erred in granting the defendant's motion for summary judgment in this particular case.

A. DID ROCHE OWE WILLIS A LEGAL DUTY IN NEGLIGENCE?

Willis first challenges the district court's determination that Roche owed no legal duty to Willis under Texas law to use reasonable care in its administration of a drug test of Willis's urine sample. We agree with Willis that the district court erred in ruling no such duty existed.

The district court's holding was predicated on the conclusion that Texas law was insufficiently developed on the specific issue of a laboratory's liability for negligent drug testing for a federal "*Erie* court" to predict, and thus that the court was forced to rely on the law of negligence as it applies to *physicians employed as independent contractors.* However, the law of Texas is indeed sufficiently clear for Erie court prediction purposes on the specific issue of a drug testing laboratory's duty to testees to use reasonable care in conducting its tests. *See, e.g., Doe v. SmithKline Beecham Clinical Laboratories, Inc.,* 855 S.W.2d 248 (Tex.App.—Austin 1993) (Carroll, C.J.) (writ of error granted Feb. 2, 1994).

In the recent Texas Court of Appeals case we deem determinative on the question of duty presented in this case—*SmithKline, supra:* an employer rescinded a job offer it had made to Plaintiff Doe, because of a "false positive" generated by the defendant outside laboratory relative to Doe's urine sample. The drug laboratory in *SmithKline* used the same testing technology as was used by Roche in Willis's case—a combination of the initial "screening" "EMIT" test and the "confirming," more sophisticated (and more reliable) "GC/MS" test), which mispurported that Doe used

10

opiates.[1]  Doe's only recourse was to reapply for employment with the company in six months;  but the company declined Doe's reapplication.  The *SmithKline* Texas intermediate appellate court opinion reverses a trial court summary judgment ruling in favor of the laboratory.

As the Texas Court of Appeals explains in *SmithKline:*

> The Texas Supreme Court has described the existence of a "duty" [in negligence cases] as follows:  "[I]f a party negligently creates a situation, then it becomes his duty to do something about it to prevent injury to others if it

---

[1] It is common for most drug testing programs to differentiate between screening and confirming tests.  The most accurate tests are expensive, slow and require highly trained personnel.  This makes them unsuitable for large scale drug screening.  The practice has developed of using an inexpensive test designed for maximum sensitivity as a screening test, followed by a sophisticated confirming test.  Screening tests are designed to yield fewer false-negative results, since a negative result will end the testing process.  By far the most frequently used screening test is the Enzyme-Multiplied Immunoassay Technique (EMIT).  * * *

* * * The principal disadvantages of the EMIT test are that adulterated urine samples can produce universally false-negative results and other prescription and nonprescription drugs may cross react, causing false-positives.  * * *

* * * [Gas Chromatography/Mass Spectrometry (GC/MS) is a commonly-used "confirming" test].  This is probably the most accurate drug testing tool.  * * * GC/MS instrumentation is usually automated and under computer control, with the instrument's operational parameters available for storage, printout, and evaluation.  Data generated from GC/MS instruments can easily be reviewed by independent third parties.  Within the scientific community, it is generally accepted that if positive screening test results are confirmed by a GC/MS test, no false positives should occur.

Douglas L. Stanley, *Employee Drug Testing,* 61 JOURNAL OF THE KANSAS BAR ASSOCIATION 19 (Jan. 1992) (citing *Reliability of Urine Drug Testing,* 258 JAMA 2587-2588 (1987)).

reasonably appears or should appear to him that others in the exercise of their lawful rights may be injured thereby." More recent cases have described duty as a function of several interrelated factors—the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct—of which the foremost and dominant consideration is the foreseeability of the risk. If a risk is foreseeable, it gives rise to a duty of reasonable care.

*SmithKline, id.* at 255 (quoting *Buchanan v. Rose,* 159 S.W.2d 109, 110 (Tex.1942); and citing *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990); *El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987); *Otis Engineering Corp. v. Clark,* 668 S.W.2d 307, 312 (Tex.1983); *Corbin v. Safeway Stores, Inc.,* 648 S.W.2d 292, 296 (Tex.1983)). Pursuant to these interrelated factors of consideration, *SmithKline* holds that a drug tester owes a duty of reasonable care to the person whose bodily fluids are assayed for traces of illegal drugs (the drug testee):

> As stated in [the Texas Supreme Court's case,] *Otis,* "changing social conditions lead constantly to the recognition of new duties." *Otis,* 668 S.W.2d at 310. If any individual has "at least partially created the danger" in issue, he is under an affirmative duty to act. *El Chico,* 732 S.W.2d at 306. We conclude that SmithKline is not merely an innocent bystander, but rather, it partially created a dangerous situation. As information services become more prevalent in our society, the information providers should be held accountable for the information they provide. Such information should be complete and not misleading. Credit-reporting agencies have long been held to the exercise of due care in securing and distributing information concerning the financial standing of individuals, firms, and corporations. *See e.g., Bradstreet Co. v. Gill,* 72 Tex. 115, 9 S.W. 753, 757 (1888). * * *
>
> * * * It is foreseeable that employers would interpret a raw result showing a positive opiate test result as exclusively indicating illegal or illicit drug use and would not consider the possibility of ... anomalies.

*SmithKline, id.* at 255-256. The evidence before the district court indicates that *Willis's* employer (Du Pont) may well have

12

interpreted the Roche-administered test results in such an "exclusively indicative" manner. One of the items of evidence the district court deemed determinative for purposes of granting Defendant-Appellee Roche's motion for summary judgment was a submitted attachment to a Du Pont employee handout, dated December 18, 1989, which "assures" potential testees-employees that Du Pont was "confident that all positive results will be as accurate as science permits." (Record, Vol. 1., p. 274).

Opinions of the Texas Courts of Appeal are "indicia of state law," which should be followed by the federal courts sitting as "*Erie* courts" absent a "*strong showing* that the state supreme court would rule differently." *Lavespere v. Niagara Machine & Tool Works, Inc.,* 920 F.2d 259, 260 (5th Cir.1990) (emphasis added; citations omitted), *cert. denied,* --- U.S. ----, 114 S.Ct. 171, 126 L.Ed.2d 131 (1993). And the fact that the Texas Supreme Court has granted a writ of error in *SmithKline,* and thus will *review* this case, does not represent such a "strong showing that the state supreme court w[ill] rule differently [from the *SmithKline* Texas Court of Appeals]." Indeed, we deem the *SmithKline* court's basic reasoning as to the existence of the drug testing laboratory's duty to be quite soundly based on established Texas law, regardless of the fact that *SmithKline* represents the first reported Texas case to directly address the particular question of the duties of drug testing laboratories to testees. *SmithKline* is certainly a better representative of relevant Texas law than is the line of physician liability cases on which the district court relied.

13

We deem it relevant as well that several other courts addressing the particular issue of whether a negligence duty runs from the drug testing laboratory to testees have deployed the same analysis exhibited in *SmithKline.* In *Elliott v. Laboratory Specialists, Inc.,* 588 So.2d 175 (La.App. [5th Cir.] 1991), *writ denied,* 592 So.2d 415 (La.1992), for example, the Louisiana Court of Appeals affirms an award of $25,000 in damages to a testee against the drug testing company administering the test, as the testing company was found to have failed to conform with appropriate and proper testing methodology. Like the Texas Court of Appeals in *SmithKline,* the *Elliott* court explains that to hold a testing laboratory does *not* owe the testee a duty to analyze his or her bodily fluid in a scientifically reasonable manner would work an abuse of fundamental fairness and justice. The *Elliott* court explains that such a laboratory should be held responsible for its conduct, as the risk of harm in our society to an individual because of a false-positive drug test is so significant that any individual wrongfully accused of drug usage by his or her employer is properly within the scope of protection under the law. *Elliott, id.; see also Lewis v. Aluminum Co. of America,* 588 So.2d 167 (La.App. [4th Cir.] 1991), *writ denied,* 592 So.2d 411 (La.1992); *Nehrenz v. Dunn,* 593 So.2d 915 (La.App. [4th Cir.] 1992). *See generally* Douglas L. Stanley, *Employee Drug Testing,* 61 JOURNAL OF THE KANSAS BAR ASSOCIATION 19 (Jan. 1992) (noting that "[t]he most accurate [drug] tests ... require highly trained personnel;" and "within the scientific community, it is generally accepted that

14

if positive screening test results are confirmed by a GC/MS test" [*i.e.,* the type of test used by Roche in this case], "*no false positives should occur* "; and reporting that, in light of these facts, a state court jury in Kansas has held *Roche* liable to a testee plaintiff for its *improperly administered* GC/MS testing of the plaintiff's urine—which faulty administration resulted in the generation and reporting of a false positive for plaintiff's illegal drug use) (emphasis added) (citing a relevant *Journal of the American Medical Association* (JAMA) article on the proposition about the generally reliable GC/MS drug testing technology: *Reliability of Urine Drug Testing,* 258 JAMA 2587-2588 (1987)). *See generally also Canipe v. National Loss Control Service Corp.,* 736 F.2d 1055 (5th Cir.1984) (reversing the district court's grant of summary judgment for the defendant in a negligence action brought (under Tennessee law) by an injured machine operator against the corporation which had contracted with the machine operator's employer to provide safety inspections and related accident-prevention services at the plant where the machine operator worked, because, *inter alia,* of the existence of genuine issues of material fact as to whether the defendant corporation *performed its undertaking* negligently, and as to whether such negligence proximately caused the machine operator's injury), *cert. denied,* 469 U.S. 1191, 105 S.Ct. 965, 83 L.Ed.2d 969 (1985).

In sum, we hold that under current Texas law, Roche owed Willis a duty of reasonable care in conducting tests on Willis's urine sample for illicit drug use by Willis, for use by Willis's

15

employer in decisionmaking relative to Willis's employment conditions.

B. DID ROCHE FULFILL ITS DUTY TO EXERCISE REASONABLE CARE IN TESTING WITH RESPECT TO WILLIS?

The district court held too that, even assuming Roche owed a duty of care to Willis, Roche fulfilled that duty and thus could not have been negligent. We conclude that the summary judgment evidence discloses otherwise.

As the party moving for summary judgment, Roche has the initial burden of submitting evidentiary documents comprising a *prima facie* showing that it is entitled to summary judgment. *Lavespere, supra,* 910 F.2d at 178. Roche met this initial burden by producing summary judgment evidence in the form of an expert affidavit—from Dr. Paula Childs, a laboratory director at Roche—that responds to and negates the allegations set out in Willis's complaint, including Willis's allegations concerning Roche's use of "the most advanced" (GC/MS) testing technology available, and its administration of that technology (the use of a particular chemical in the application of the GC/MS technology).

Hence, the burden was "shifted" to Willis to go beyond his pleadings, and set out specific facts—supported by evidence—to show summary judgment was not appropriate, because genuine fact issues exist. *Lavespere, supra.* To this end, Willis attached to his affidavit a Du Pont memorandum, which states: (1) Roche had discovered a potential problem with methodology used to confirm positive tests for methamphetamines; (2) that it appeared that this problem was isolated to Roche and to the confirmation of

methamphetamines; and (3) that it appeared the problem began in June 1990. This evidence and the inferences from it, viewed in the light most favorable to Willis, indicate that something unique to Roche's application of the GC/MS testing technology resulted in a Roche problem with confirming positive test results. Although the memorandum gives no indication of exactly when Roche discovered a problem existed, read in the light most favorable to Willis, it suggests that Roche knew or should have known of a problem with its methodology as early as June 1990—two months before Roche tested Willis's urine specimen. Summary judgment evidence further discloses that Roche lost its National Institute on Drug Abuse (NIDA) certification because of the disproportionately high level of false positives generated by its particular administration of the GC/MS methamphetamine tests.

Willis has therefore called into (genuine, material) question whether Roche used due, reasonable care in testing Willis's urine sample. *See, e.g., Humphreys v. PIE Nationwide, Inc.,* 723 F.Supp. 780 (N.D.Ga.1989) (holding that material issues of fact, precluding summary judgment, existed as to whether the defendant employer had followed the proper chain of custody procedures in connection with the handling of the plaintiff's urine sample for drug testing purposes). Roche's summary judgment argument that it was using "the most advanced" testing technology available when it tested Willis's sample—and therefore could not, as a matter of law, be held to have used anything but reasonable care in its testing of Willis's urine sample—provides it with no summary judgment shield

17

against the obvious genuine issue of material fact in this case as to how it actually *administered* or *deployed* this technology relative to Willis's urine sample. Roche's argument is akin to the obviously untenable position that there could not be a genuine issue of material fact about whether a driver of an automobile in a car crash was negligent in her operation of the vehicle, simply because the vehicle is generally recognized in the automobile industry as the safest of all cars currently sold. *See generally Canipe v. National Loss Control Service Corp.,* 736 F.2d 1055 (5th Cir.1984) (reversing the district court's grant of summary judgment for the defendant in a negligence action brought by an injured machine operator against the corporation which had contracted with the machine operator's employer to provide safety inspections and related accident-prevention services at the plant where the machine operator worked, because, *inter alia,* genuine issues of material fact existed as to whether the defendant corporation *performed its undertaking* negligently and whether such negligence proximately caused the machine operator's injury), *cert. denied,* 469 U.S. 1191, 105 S.Ct. 965, 83 L.Ed.2d 969 (1985).

In sum: longstanding, bedrock summary judgment principles—from the days when summary judgment was a relatively disfavored judicial device, and continuing through the Supreme Court's 1986 "trilogy" of summary judgment cases liberalizing the utilization of the device[2]—are to the effect that fact questions

---

[2]*See Matsushita Electric Industrial Co. v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202

18

are considered with deference to the nonmovant, *inferences* to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, and, in general, genuine issues of material fact are to be left for reasonable resolution by the fact-finder. Under any principled summary judgment analysis, the record in this case demonstrates the existence of genuine issues of material fact as to Roche's negligence in conducting a urinalysis for drug use on Willis's urine sample which resulted in a "false positive." The issue is *not* whether *we* (or the district court) think(s) Plaintiff will or will not prevail at trial. The issue is whether there exist genuine, material fact issues for resolution by the trier of fact. And whether Roche fulfilled its duty of reasonable care when it tested Willis's urine for methamphetamine use is a genuine, material, disputed fact issue on the record before us. Drawing all reasonable inferences in favor of Summary Judgment Nonmovant Willis, as we must, we conclude that the record in this case contains evidence from which a jury could reasonably conclude that Roche was negligent in the manner in which it administered the generally reliable GC/MS drug testing technology relative to Willis's urine sample, and that such negligent application of this test technology proximately caused injury to Willis. Accordingly, we hold that the district court erred in concluding that there was no genuine issue of material fact for fact-finder resolution as to

_____

(1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

whether Roche fulfilled its duty to Willis.

## C. REGARDING WILLIS'S NEGLIGENCE DAMAGES; OR, DID WILLIS FAIL TO PLEAD A VIABLE THEORY OF RECOVERY?

Appellee Roche has also argued on appeal that affirmance of the district court's entry of summary judgment is necessary because Willis failed to even plead a viable cause of action under Texas law. Roche relies on the Texas Supreme Court's recent opinion in *Boyles v. Kerr,* 855 S.W.2d 593 (Tex.1993), for the proposition that Texas does not recognize a cause of action for negligent infliction of emotional distress.[3]

While it is true that the Texas Supreme Court holds in *Boyles* that "there is no general duty not to negligently inflict emotional distress[,]" the *Boyles* court also carefully explains that its "decision does not affect a claimant's right to recover mental anguish damages caused by defendant's breach of some other legal duty." *Boyles,* 855 S.W.2d at 597. Simply put: *Boyles* does not overrule Texas law generally developing negligence duties, breaches, and damages—which law constitutes the type of case Willis pleaded and controls the question of whether there exist or do not exist genuine issues of material fact in this case. Indeed, the *Boyles* court even emphasizes that it does not disturb the "negligent infliction of emotional damage" caselaw concerning

---

[3]In *Boyles,* the plaintiff, a college student, brought an action against her sexual partner for negligent infliction of emotional distress she suffered due to various people seeing a videotape of her and Boyles engaged in sexual intercourse, filmed by Boyles. Allegedly, ten of Boyles's friends were shown the tape, and gossip about it spread to Kerr's friends as well as other students at the university she attended.

*duties derived from special business relationships. Boyles, id.,* 855 S.W.2d at 597. *See Stuart v. Western Union Tel. Co.,* 66 Tex. 580, 18 S.W. 351 (1885) (failure of telegraph company to timely deliver death message); *Billings v. Atkinson,* 489 S.W.2d 858 (Tex.1973) (telephone company employee's invasion of a service subscriber's privacy); *Pat H. Foley & Co. v. Wyatt,* 442 S.W.2d 904 (Tex.Civ.App.—Houston [14th Dist.] 1969, writ ref'd n.r.e.) (funeral home's negligent handling of a corpse).

Roche's attempts to make a legal mountain out of the *Boyles* molehill notwithstanding, all *Boyles* holds is that Texas law does not "impose legal duties based *solely on a personal relationship, even an intimate one."  Boyles,* 855 S.W.2d at 600 (emphasis added). Roche's legal obligation to use due, reasonable care in testing Willis's urine sample for drug use arises out of the assumption for consideration by the testing laboratory of the task of drug-testing, and the fact that it is clearly foreseeable that if this testing task is misconducted (no matter how advanced the general test technology so administered might be) the testee will sustain cognizable injury.  This narrow duty is fundamentally dissimilar from the amorphous duty not to negligently inflict emotional distress at issue in and rejected by the Texas Supreme Court in *Boyles.*

D. DOES WILLIS HAVE A CAUSE OF ACTION AGAINST ROCHE FOR DEFAMATION?

Finally, Willis has sought damages from Roche for the latter's publication of the false positive test results to Willis's employer.  Roche has responded that Willis signed a consent form,

21

granting permission to release the results of such tests to Du Pont. The form reads: "I furthermore give (outside laboratory) my permission to release the results of such tests to the company." (Record Vol. 1., p. 252).

However, in Texas, a purported consent and waiver that does not expressly release liability for negligence does not constitute an effective release from liability for negligence. Texas has adopted the "express-negligence" doctrine, which requires any purported indemnity agreement to expressly state that it applies to "negligence" in order to be deemed effective as a release for negligence liability. *See, e.g., Doe v. SmithKline Beecham,* 855 S.W.2d 248 (Tex.App.—Austin 1993).[4] We thus hold that the form at issue in this case is insufficient to release Roche from liability for publication of *negligently obtained* false positive results.

Still, the district court (citing *Boze v. Branstetter,* 912 F.2d 801, 806 (5th Cir.1990)) also decided that, even *without* a valid consent and in light of a "defamatory" report, Roche's defamatory publication was nonetheless qualifiedly privileged. The district court's analysis in this respect follows:

> Th[is] privilege advances "the need for free communication of information to protect business and personal

---

[4]The waiver at issue in *SmithKline* contained the following exculpatory language, which the *SmithKline* court holds inadequate to shield SmithKline from liability for its negligence—in light of the "express-negligence" doctrine: "I consent to the release of the drug screen results to authorized Quaker representatives for appropriate review. I release and agree to hold harmless Quaker, its employees and its agents, from any liability to me based on the results of the drug screening." *Doe v. SmithKline Beecham,* 855 S.W.2d 248, 253 (Tex.App.—Austin 1993) (Carroll, C.J.) (writ of error granted Feb. 2, 1994).

22

interests." *Gaines v. CUNA Mut. Ins. Soc'y,* 681 F.2d 982, 986 (5th Cir.1982). In order for the moving party to prevail on a summary judgment asserting this privilege, however, an absence of malice must be shown. *Houston v. Grocers Supply Co., Inc.,* 625 S.W.2d [798] at 801 [Tex.App.1981].

The only manifestation of malice established by plaintiff stems from the very fact that the test results were false. The law is clear, " "[m]alice is not implied or presumed from the mere fact of the publication, nor may it be inferred alone from the character or vehemence of the language used, nor found from the falsity of the statement alone.' " *Houston Belt & Terminal Ry. Co. v. Wherry,* 548 S.W.2d [743] at 754 [Tex.Civ.App.1976] (citations omitted). Plaintiff has failed to demonstrate express malice or implied malice.

Record Vol. 1., p. 424. We agree with this reasoning and conclusion by the district court; and hold therefore that the trial court was correct in granting Roche's motion for summary judgment on Willis's defamation claim.

## V. CONCLUSION AND ORDER

For the foregoing reasons: the portion of the district court's Memorandum Opinion and Order granting summary judgment to Roche on Willis's negligence-in-testing claim is REVERSED and REMANDED for further proceedings consistent with this Opinion; and the portion of the district court's Memorandum Opinion and Order granting summary judgment to Roche on Willis's defamation claim is AFFIRMED.

It is Hereby So Ordered.

E. GRADY JOLLY, Circuit Judge, dissenting:

As Judge Parker's opinion properly notes, the bottom-line question in the present case is whether the district court erred in granting the defendant's motion for summary judgment. After a careful review of the applicable law and the relevant parts of the

23

record, I am convinced that the trial court committed no error. Because the summary judgment evidence produced by Willis was insufficient to support a jury finding of negligence on the part of Roche, I respectfully dissent.

The initial—and fundamental—problem with the majority opinion is that it views the district court's grant of summary judgment through the old and scratched lens of ancient summary judgment law as it stood before the Supreme Court's 1986 summary judgment trilogy, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Although the motion for summary judgment was harshly viewed and strongly discouraged prior to 1986,[1] the Supreme Court made clear in *Celotex* that summary judgment should *not* be regarded as a *disfavored* procedural shortcut: Summary judgment is "an integral part of the Federal Rules ... which are designed "to secure the just, speedy and inexpensive determination of every action.' " *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.Proc. 1).

Although the majority begrudgingly pays muffled lip service to the current law on summary judgment, it makes clear its disfavor for such principles at the very beginning of its opinion, intimating that we should be particularly wary of this grant of

---

[1] 1 STEVEN A. CHILDRESS & MARTHA S. DAVIS, FEDERAL STANDARDS OF REVIEW § 5.04, at 5-26 (2d ed. 1992).

summary judgment.  First, the majority states that courts must be careful not to " "use summary judgment as a "catch penny contrivance." ' "  See slip op. at 4542.  This particular fear of summary judgment finds its roots in a *1940* Fifth Circuit case.[2] Furthermore, the primary and more recent case on which the majority relies, *Fontenot v. Upjohn,* used this language specifically to emphasize that courts should *not* be so suspicious of summary judgment—the "early disposition of baseless claims and defenses is insistent and well founded."  *Fontenot,* 780 F.2d at 1197.  After the trilogy, it is clear that "[o]ld dicta urging unusual restraint are no longer valid."  1 CHILDRESS & DAVIS, *supra* note 1, § 5.04, at 5-48.

Next, the majority states that summary judgment should not be applied in negligence cases.  See slip op. at 4544.  Again, however, its support for this dubious overstatement is tenuous: The Wright & Miller citation noted by the majority in turn cites a North Carolina state court case as its authority,[3] and the majority's other citation, *Gauck v. Meleski,*[4] dates back to 1965. Furthermore, even though we repeated this sentiment in a more

---

[2]The majority cites *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1197 (5th Cir.1986) (quoting William W. Schwarzer, *Summary Judgment Under the Federal Rules:  Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 466 (1984), which in turn quotes *Whitaker v. Coleman,* 115 F.2d 305, 307 (5th Cir.1940)).

[3]*See* 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2729 (Supp.1993) (citing *Smith v. Selco Products, Inc.,* 96 N.C.App. 151, 385 S.E.2d 173, 175 (1989)).

[4]346 F.2d 433, 437 (5th Cir.1965).

recent case, *Lavespere v. Niagara Mach. & Tool Works, Inc.,*[5] we went on to uphold the district court's grant of summary judgment in that case, noting that the determinative question is *whether there is sufficient evidence* to support a jury finding in favor of the nonmovant.  If there is insufficient evidence, a jury can decide no question, no matter how "inherently normative" the question may be. *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d at 178-79; *see also Fontenot,* 780 F.2d at 1196 (summary judgment was appropriate in defective design case).

Ultimately, the majority concludes that Willis has "called into question" whether Roche was negligent in its testing of Willis's urine sample.  Slip op. at 4547.  Again, however, the majority's focus is outdated.  There is no doubt that some questions do remain unresolved in the scant record before us, but, in the light of the summary judgment law applicable today, those questions are not *the* question.[6]  After *Celotex,* the question is whether the parties to the suit have satisfied their respective evidentiary burdens.  In the present case, the answer is no: Willis simply did not carry his burden.

---

[5]910 F.2d 167, 178-79 (5th Cir.1990), *cert. denied,* --- U.S. ----, 114 S.Ct. 171, 126 L.Ed.2d 131 (1993).

[6]"[T]he Court now frames the primary issue in summary judgment motions not as whether enough evidence exists to raise an inference to be resolved at trial, but whether sufficient evidence in the pretrial record exists to allow the plaintiff to win at trial or to survive a motion for directed verdict, were one based on the facts in the pretrial record.  That is a higher threshold for nonmovants to survive a summary judgment motion than was expressed in prior Supreme Court cases."  1 Childress & Davis, *supra* note 1, § 5.04, at 5-32.

In *Lavespere* we stated that a movant for summary judgment can satisfy his initial burden by "submit[ting] evidentiary documents that negate the existence of some material element of the nonmoving party's claim or defense." *Lavespere,* 910 F.2d at 178. In the present case, Roche produced summary judgment evidence, in the form of an expert affidavit, that specifically and completely responded to, and negated every allegation set out in Willis's complaint. Thus, Roche made a prima facia showing that it was entitled to summary judgment, and the summary judgment burden then shifted to Willis to show that a genuine, material issue of fact remained for trial.

In order to carry this responsive burden, Willis was required to go beyond his pleadings and produce evidence that would have supported a reasonable jury in returning a verdict in his favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Willis's evidence should have contained "specific facts,"[7] because *Anderson* provides that if the pretrial evidence "is merely colorable" or "is not significantly probative," summary judgment should be granted. *Anderson,* 477 U.S. at 249-50, 106 S.Ct. at 2511. When the nonmoving plaintiff comes forth with unspecific, insufficient evidence, the court must grant the summary judgment because, in that case, only an irrational trier of fact could return a verdict in the plaintiff's favor. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356 ("Where the record taken as a whole could not lead a

---

[7]Fed.R.Civ.Proc. 56(e); *see Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *Lavespere,* 910 F.2d at 178.

*rational* trier of fact to find for the nonmoving party, there is no "genuine issue for trial.' " (emphasis added)).

In an attempt to meet his burden, Willis produced the following evidence:

1. Roche discovered a potential problem with methodology used to confirm positive tests for amphetamines;

2. it appeared that this problem was isolated to Roche and to the confirmation of amphetamines; and

3. it appeared the problem began in June 1990.

Judge Parker states that this evidence, "read in the light most favorable to Willis ... suggests that Roche knew or should have known of a problem with its methodology as early as June 1990." Slip op. at 4547. Willis's evidence, however, "suggests" no such conclusion, much less offers and evidentiary proof, either direct or circumstantial.[8] In all due respect, no rational court would hold Roche liable in negligence based on this scant and disconnected evidence.

As the majority has noted, it is a "longstanding, bedrock summary judgment principle[ ]" that we must construe the evidence presented, and any reasonable inferences therefrom, in the light most favorable to the nonmovant. This standard, however, does not allow, much less require, that we draw strained and *unreasonable* inferences in favor of the nonmovant. In the present case, in

_____

[8]Nowhere in Willis's briefs does he argue that Roche should have known of a problem with its methodology as early as June 1990, which is the theory of negligence advanced by majority opinion. Thus, the majority not only supplies speculative evidence to fill the evidentiary gaps left by Willis, but it supplies his theory of negligence as well. The wonder is whether there remains any role for Willis's lawyer.

28

order for a jury to return a verdict in favor of Willis, it would either have to make an unsupported leap in logic or rely on speculative evidence that certainly is not included in the summary judgment record. Thus, based on the record evidence standing alone, no reasonable juror could conclude that Roche failed to use due care.

The essence of Willis's failure is that his evidence simply fails to go far enough to establish negligence. In other words, Willis's summary judgment evidence may, to be sure, leave open the *possibility* that Roche was negligent, i.e., nothing in the evidence *forecloses* the possibility that Roche should have known that its testing methodology was unreliable. But Willis was required to do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. A "merely colorable" claim is not enough. *Anderson,* 477 at 249-50, 106 S.Ct. at 2511. Instead, Rule 56 demands that Willis set out "specific facts" pointing *to some act of negligence on the part of Roche. See Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *Lavespere,* 910 F.2d at 178.

Willis, however, came forth with no such minimally required evidence. Willis identified no single negligent act of Roche or of anyone else. Instead, the extent of Willis's evidence was that anomalies had resulted from Roche's drug testing procedures, that Roche had discovered the problem, and that Roche had its NIDA certification revoked because of excessive false-positive results. Willis's evidence detailing the problem that Roche discovered

(i.e., that the chemical agent CHFB reacted with ephedrine and pseudoephedrine to produce a false positive result) may well prove the *cause* of his anomalous drug-test results, but it in no way supports a finding of negligence on the part of Roche.[9]

In sum, I find that the majority has taken this weak, factually-unsupported case, and has back filled the facts and engineered the applicable law at every turn in order to reverse the district court's judgment and to remand the case. Even the legal basis for this negligence claim is anything but settled under Texas law.

As it was presented in the district court, and as it is now presented to us, this is a meritless case that was wholly appropriate for summary judgment. I would affirm.

---

[9]Willis's failure in this regard presents yet another basis for affirming the district court's grant of summary judgment on Willis's *defamation* claim. *See* slip op. at 4550-51. Willis's evidence will not support an essential element of his defamation claim—that is, Willis cannot show that Roche published information that it *should have known* was false. *See Durham v. Cannan Communications, Inc.,* 645 S.W.2d 845 (Tex.App.—Amarillo 1982, writ dism'd).